[Crim. No. 6428. Third Dist. Feb. 3, 1972.]

In re LEROY HUTCHINSON on Habeas Corpus.

[Crim. No. 6427. Third Dist. Feb. 3, 1972.]

In re LUXEY IRVIN on Habeas Corpus.

(Consolidated Cases.)

## COUNSEL

B. E. Bergesen III and Jeffrey Glenn for Petitioners.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Nelson P. Kempsky and Edward A. Hinz, Jr., Deputy Attorneys General, for Respondent.

## OPINION

**JANES, J.**—On November 22, 1971, when each of these habeas corpus proceedings was commenced, petitioners were both inmates at Deuel Vocational Institution (DVI) and were confined in the K-Wing portion of that facility. K-Wing is the maximum security section of DVI and is used for inmates who are on isolation, segregation, or protective custody status. Facilities, privileges, security measures, and living conditions are more stringent in K-Wing than elsewhere in the institution.

Each petitioner sought release from K-Wing and return to the general (main-line) DVI population. We issued orders to show cause, and thereafter consolidated the two proceedings for hearing and decision. Subsequent to issuance of the orders to show cause, and prior to the hearing held in this court on January 20, 1972, petitioner Irvin was transferred to the California Correctional Institution at Tehachapi. As to him,

therefore, the issue of confinement in K-Wing is moot; we will discharge the order to show cause and deny his petition. (See *In re Lopez* (1969) 1 Cal.App.3d 683, 686-687 [82 Cal.Rptr. 129].) Petitioner Hutchinson, however, was still in K-Wing on the date of that hearing; and subsequent thereto we have not been informed of any change in his status.[1]

Hutchinson's verified petition alleges that, during the more than 5½ years in which he has been confined in California prisons, "he has received only one write-up which is in any way related to violence, to wit: a charge of threatening a guard at CMC-East, for which he was 'sentenced' to be locked up for five days and to forfeit one weekend's privileges." The petition further alleges that Hutchinson has engaged in no acts of violence, and has committed only one minor infraction of prison regulations, subsequent to his arrival at DVI in April 1971; that on August 22, 1971, he was summarily removed from the main-line and placed in K-Wing without notice or hearing; that he has thereafter been continuously incarcerated in K-Wing; and, upon information and belief, that as a result of the George Jackson escape attempt at San Quentin on August 21, 1971, Hutchinson "is being confined in K-Wing primarily because of his political beliefs, with which respondent Patterson [DVI superintendent] and other DVI officials do not agree, and to which they do not wish the main line inmates at DVI exposed."

Attached to Hutchinson's petition is a copy of a letter from the Chief Deputy Director of the Department of Corrections, dated September 16, 1971, which in relevant part says: "It is true that Mr. Hutchinson is in segregation at the present time. He is there not because of any misconduct on his part; merely, because it was felt by the officials at Deuel Vocational Institution that segregated housing was the best place for Mr. Hutchinson at this time in view of the general unrest in prisons."

Hutchinson contends that his confinement in K-Wing violates the free

---

[1]On February 3, 1972, after preparation of this opinion, this court was advised by the office of the Attorney General that Hutchinson was "scheduled" for transfer that same day to the general prison population in the California Correctional Institution at Tehachapi, and that the court would be provided with documentation of that transfer after its occurrence. Although we do not question the Attorney General's representations, the opinion as prepared is nonetheless appropriate. Hutchinson's case, even if rendered moot, raises issues of lasting public importance which, as a practical matter, can only be presented in habeas corpus proceedings. Moreover, even that remedy would be ineffective for Hutchinson if, in effect, institutional transfers could intervene to deny him a declaration as to his rights in future confinement. (See, 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 117, pp. 3893-3895; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 469-470, pp. 4424-4428.) Similar considerations, of course, apply to Irvin's petition, which we deny as moot. However, the legal principles which this opinion reaffirms as to Hutchinson will afford Irvin adequate safeguard if in the future he is subjected to comparable circumstances.

speech guarantee of the First Amendment, constitutes cruel and unusual punishment under the Eighth Amendment, and denies him equal protection of the laws, as well as procedural and substantive due process, under the Fourteenth Amendment.

The gist of respondent's return is that petitioner Hutchinson is a black militant with a demonstrated ability to lead other inmates—a man who is articulate, outspoken, and filled with hostility and resentment toward the "white power structure." Respondent claims that Hutchinson, under commitment for armed robbery and first degree murder, led a strike at another institution in April 1971, started a fire in his cell at DVI in May 1971, distributed literature attacking the "system" to other inmates, and was deeply upset by the death of George Jackson. Respondent contends that a volatile, potentially explosive situation existed among the inmates at DVI after Jackson was killed, and that "Hutchinson needed to be removed from the general population for the sake of the institution's tranquility."

Hutchinson filed numerous affidavits and related documents in support of his petition and traverse, and the Attorney General, by return in respondent's behalf, submitted a plethora of institutional records and reports concerning Hutchinson. The record furnished by respondent makes clear that Hutchinson's transfer to K-Wing on August 22, 1971 was, in the superintendent's view, necessary for the security of DVI and the safety of both inmates and prison personnel during the "time of great tension" following Jackson's death. In all, approximately 35 to 40 inmates were placed in K-Wing as part of those security measures. A general "lock-up" of all other inmates was instituted at DVI at the same time.[2]

Courts are and naturally should be reluctant to enter the thicket of prison discipline and control. Accusations of capriciousness or abuse of discretion on the part of those charged with administering the prisons "must be carefully scrutinized and the facts carefully weighed with the thought in mind that they are frequently filed by prisoners who are keen and ready, on the slightest pretext, or none at all, to harass and to annoy the prison officials and to weaken their power and control. These prisoners include many violent and unscrupulous men who are ever alert to set law and order at defiance within or without the prison walls." (*In re Riddle* (1962) 57 Cal.2d 848, 852 [22 Cal.Rptr. 472, 372 P.2d 304].)

---

[2]According to the affidavit of the DVI superintendent, "[t]he effort was generally successful. The ending of the lock-up [on or about August 28, 1971] did not result in violence. However for several days afterward, tension was high and on September 2 two correctional officers were assaulted and one stabbed, nearly fatally, by two inmates on Restricted Work Crew Status, an intermediate stage between segregation and main-line. The more seriously injured officer was critical for a time and has not yet recovered. [Par.] I continue to feel that the assignment to segregation status of

At the same time, courts must bear in mind that a person is not deprived of all of his constitutional rights by reason of his incarceration for a felony, although reasonable regulation of those rights is permitted. (*In re Jones* (1962) 57 Cal.2d 860, 862 [22 Cal.Rptr. 478, 372 P.2d 310].) "A convicted felon, although civilly dead [citations] is nevertheless . . . entitled to the protection of the Fourteenth Amendment. [Citations.] There are many cases upholding the right of such persons to equal protection [citations] and to due process [citations]." (*In re Jones, supra,* at p. 862.)

Balancing the principles enunciated in *Riddle* and *Jones, supra,* we find it unnecessary to second-guess the reasonableness of the superintendent's action in transferring petitioner Hutchinson to K-Wing on August 22 and in keeping him there during the "time of great tension" which followed the Jackson incident. It may be fairly inferred from the superintendent's own affidavit, however, that the period of tension did not extend beyond September 1971. (See fn. 2, *supra.*) In the face of petitioner's allegations attacking his continued confinement in K-Wing, respondent has tendered no facts whatever to justify such incarceration after September; and at the oral argument herein on January 20, 1972 (when Hutchinson was still in K-Wing), respondent made no claim that the tension which Jackson's demise allegedly triggered at DVI still persisted.

A prison inmate is entitled to relief by habeas corpus if he alleges and proves that "excessive punishment was inflicted upon him in violation of his fundamental and basic rights." (*In re Riddle, supra,* 57 Cal.2d at p. 852.)  Accepting respondent's assertion that his motivation on August 22 was not to punish Hutchinson but rather to protect DVI, we cannot blind ourselves to the fact that, where attendant restrictions are the same, there is no meaningful difference between punishment and preventive segregation. (Cf. *Howard* v. *Smyth* (4th Cir. 1966) 365 F.2d 428.) Segregation under conditions of maximum security must be deemed excessive where it is of such duration that, as in Hutchinson's case, the prison authorities offer no facts which justify its continuance. (See *Dabney* v. *Cunningham* (E.D.Va. 1970) 317 F.Supp. 57, 61.)

The orders to show cause are discharged. The petition in 3 Crim. 6427 (Irvin) is denied as moot. In 3 Crim. 6428, no reason being shown for petitioner Hutchinson's continued incarceration in K-Wing, it is ordered that he be returned forthwith to the general prison population at Deuel Vocational Institution and that he be permitted to remain in the general

---

those thirty-five to forty men was a necessary act. While it was harsh for the men involved, more than their welfare was involved. The welfare and safety of all twelve hundred inmates and four hundred seventy staff were involved. Tension and fear was high, and isolation of those most likely to incite violence offered the best hope for returning the institution to normal at the earliest possible time."

prison population at that institution or any institution to which he may be transferred, so long as he conforms with generally applicable prison regulations and absent any other lawful cause for a different placement. Except to the extent that the relief prayed for has been granted petitioner Hutchinson herein, his petition for a writ of habeas corpus is denied.

Richardson, P. J., and Regan, J., concurred.

Petitions for a rehearing were denied March 1, 1972, and the application of petitioner Irvin for a hearing by the Supreme Court was denied March 30, 1972.